Bob LINDSEY and Margaret LINDSEY *v.*
Julie KETCHUM et al

CA 83-28                                    661 S.W.2d 453

Court of Appeals of Arkansas
Division II
Opinion delivered December 7, 1983

*Sanford, Pate & Marschewski,* by: *Jon R. Sanford,* for appellants.

*Jon A. Williams,* Western Arkansas Legal Services, for appellee.

DONALD L. CORBIN, Judge. Appellants, Bob and Margaret Lindsey, sought to adopt Brandy Ketchum, a minor female child, pursuant to Ark. Stat. Ann. § 56-220 (c) (2) and (3) (Supp. 1983). The natural parents defaulted in responding to appellants' petition for adoption; however, the natural mother, Julie Williams, a/k/a Julie Ketchum, appeared and testified in the adoption proceedings. The probate judge denied appellants' petition for adoption. However, as the chancellor in the companion custody case, the trial court continued custody in appellants and denied the natural parents any visitation privileges with the minor child. We reverse and remand.

We review probate proceedings *de novo* on the record. It is well-settled that the decision of a probate judge will not be disturbed unless clearly erroneous (clearly against the preponderance of the evidence), giving due regard to the opportunity and superior position of the trial judge to determine the credibility of the witnesses. A.R.Cr.P. Rule 52 (a); *Henson* v. *Money,* 1 Ark. App. 97, 613 S.W.2d 123 (1981).

Appellants urge us to reverse on the basis that the decision is unsupported by the evidence. In their petition for adoption, appellants relied upon Ark. Stat. Ann. § 56-220 (c) (2) and (3) (Supp. 1983), which provide for the relinquishment of the rights of a parent and the termination of the parent and child relationship under certain circumstances as follows:

(c) In addition to any other proceeding provided by law, the relationship of parent and child may be terminated by a court's order issued in connection with an adoption proceeding under this Act [§§ 56-201 — 56-221] on any ground provided by other law for termination of the relationship, and in any event on the ground (2) that by reason of the misconduct, faults, or habits of the parent or the repeated and continuous neglect or refusal of the parent, the minor is without proper parental care and control, or subsistence, education, or other care or control necessary for his physical, mental, or emotional health or morals, or, by reason of physical or mental incapacity the parent is

unable to provide necessary parental care for the minor, and the court finds that the conditions and causes of the behavior, neglect, or incapacity are irremediable or will not be remedied by the parent, and that by reason thereof the minor is suffering or probably will suffer serious physical, mental, moral, or emotional harm, or (3) that in the case of a parent not having custody of a minor, his consent is being unreasonably withheld contrary to the best interest of the minor.

The natural relationship between parent and child is subject to absolute severance in an adoption proceeding. The courts are inclined to favor the maintaining of the natural relationship when the adoption is sought without the consent of a parent and against his or her protest. *Harper* v. *Caskin,* 265 Ark. 558, 580 S.W.2d 176 (1979). In *Huey* v. *Lente,* 85 N.M. 597, 514 P.2d 1093 (1973), a case construing a New Mexico statute similar to Ark. Stat. Ann. § 56-220, it was stated that actions for termination of parental rights require clear and convincing proof.

Our research of the law in Arkansas leads us to the conclusion that Ark. Stat. Ann. § 56-220 (c) (2) and (3) (Supp. 1983), have not been construed by our appellate courts to date with the exception of the Arkansas Supreme Court's recent decision in *Wineman* v. *Brewer,* 280 Ark. 527, 660 S.W.2d 648 (1983). In *Wineman, supra,* one of the arguments on appeal was that the evidence did not support the probate judge's finding that appellant unreasonably withheld his consent to the adoption contrary to the child's best interest. In affirming the adoption below, the Court relied upon the extensive findings of fact supporting the decision of the trial court. Those findings included appellant's employment history, his struggles with alcohol, his living arrangement at the time of the hearing and the fact that the child's mother had already consented to the adoption.

Subsection (c) (3), the provision upon which we reverse, provides a procedure for terminating a parent-child relationship without the consent of the natural parent. It does not require a separate petition for termination of parental rights but allows the parental relationship to be terminated

by a court order in connection with an adoption proceeding if the requisite grounds are satisfied.

Montana, New Mexico, North Dakota, Ohio and Oklahoma have also adopted the Uniform Adoption Act with some variations. Ark. Stat. Ann. § 56-221 (Supp. 1983), provides that:

This Act [§§ 56-201 — 56-221] shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

For instructive purposes, we turn to those jurisdictions who have statutes similar to ours for guidance. The North Dakota Supreme Court's decision in *Kottsick v. Carlson*, 241 N.W.2d 842 (1976), provides some assistance in its application of N.D. Cent. Code § 14-15-19 (3) (c), a provision worded exactly the same as the one at issue in the case at bar. There, a divorced wife and her new husband instituted proceedings to adopt the minor children of the wife and her former husband without his consent. Custody of the children had been awarded to appellant/wife pursuant to a divorce decree with visiting rights to appellee and requiring him to pay child support. Upon trial, the court issued a judgment denying the petition of appellants. On appeal appellants contended the trial court erred in its application and interpretation of N.D. Cent. Code § 14-15-19(3)(c), and asked that the judgment be reversed or that the matter be returned to the trial court with directions to apply the correct interpretation and concepts of law. Following its recitation of the pertinent statutory provisions, the court noted that there was no claim or evidence that appellee had been guilty of any of the conduct described in subsection (a) or (b) of the statute, nor of any conduct which would constitute grounds for termination of his parental right. Appellants argued that (c) applied and that under the facts of the case the court could terminate appellee's parental rights and permit the adoption of his sons. Appellants contended that appellee was a "parent not having custody of a minor" and that appellants merely had to show that appellee was unreasonably withholding consent to the adoption, contrary to the best interest of the children. Following a lengthy discussion of the legal

meaning of the word "custody," the court considered decisions from other jurisdictions that allow termination of the natural parents' rights without their consent where it is found to be in the best interest of the child. One such jurisdiction was Maryland and its statute (Md. Code Ann. Art. 16 § 74, Repl. Vol. 1973), provides that the court may grant a petition for adoption without consent if it finds that such consent is being withheld contrary to the best interests of the child. The *Kottsick* court cited *Logan* v. *Coup*, 238 Md. 253, 208 A.2d 694, 696 (1965), wherein the Maryland court found no voluntary relinquishment or abandonment of the child and had to determine where the best interests of the child lay. The court quoted from an earlier Maryland case, *Shetler* v. *Fink*, 231 Md. 302, 190 A.2d 76 as follows:

> While all the facts and circumstances in a case must be considered, the cases, which reached this Court on the merits of the question whether or not adoption should be granted, seem to indicate that willful abandonment, failure to contribute to support, neglect to see or visit, and unfitness of a natural parent, are some of the important factors to be considered in determining whether consent has been injustifiably [sic] withheld; and that station in life and financial and religious considerations are of secondary importance. On the other hand, the natural rights of a natural parent that have not been lost or forfeited by his or her acts or conduct must be carefully weighed and considered in deciding the question.

After reviewing the basis for the caselaw as it had been developed over the years, the *Kottsick* court stated as follows:

> . . . [i]t appears that the grounds for termination of parental rights must rest upon the attitude, conduct, ability, and such other matters relating to the parent's duties, responsibilities and care for the child which may be, and frequently are, collectively referred to as "fitness." The relationship of parent and child consisting of a bundle of essential human rights necessary for the preservation of society must be carefully balanced and jealously guarded. There is a vast difference

between the granting of "custody" in a divorce action and the "termination of parental rights." The terms "custody" and "best interests of the child" have become terms of art which reflect and convey certain meanings in divorce proceedings. "The best interests of the child" in termination of parental rights, in connection with adoption, takes on another meaning which includes, among other things, the total relationship between the child and parent pertaining to and involving heterogeneous values, rights, duties and concepts. In sequence, the termination question should be resolved first, and the adoption thereafter. But this does not mean two separate proceedings. If followed in such sequence the two issues would remain more identifiable. In parental rights termination matters the "faults," if any, of the parent are considered, which in no way can be considered "faults" of the child who is the innocent party or "victim of circumstances."

Appellant petitioned for a rehearing for clarification as to what would be admissible on the rehearing on the matter of fitness to which the court responded: "Any evidence having probative value to a court of equity as to the present and prospective fitness of the parent is admissible."

The testimony and evidence in the case at bar reveals that the natural mother/appellee had left school and home and started drinking at age fifteen, became pregnant while in a foster home and gave that child to her own mother to raise, became involved in both using and selling drugs, lived with a total of six men, one of whom was the child's father, bore the child in question and finally married the father. The natural parents manufactured, bought, sold and used drugs continuously as money would allow and drank constantly. Brandy was subjected continuously to almost every abuse known: physical abuse and in having human feces rubbed in her face, being forced to stay in bed without exercise so continuously that she was in very poor physical condition, beaten on the head and face in lieu of conventional spankings, permitted to masturbate until her vaginal area was raw, and deprived of balanced meals. The mental abuse consisted of being dropped into

bed to scare her, left in the house alone, and being referred to by obscene names. Emotional and moral abuse consisted of her father's fondling her genitals and permitting other men to do so, of being exposed to her father in the nude, being exposed to adults engaging in sexual intercourse, voyeurism and masturbation, and in being exposed to the drunken conduct of her parents, including beating and physical violence, and being taken to entertainment totally unfit for a child.

On July 13, 1980, appellee voluntarily placed her four-year-old child with appellants to enter a drug and alcohol rehabilitation program for a period of 28 days. Appellants obtained legal custody of Brandy on July 17, 1980. Appellee executed a waiver of notice and hearing and consent to the appointment. Appellee did not communicate with her child while in the rehabilitation program and made infrequent visits prior to appellants' filing their petition for adoption on August 19, 1981. Thereafter, appellants refused one request for visitation with the child by appellee. At the time of trial, appellants had had continuous custody of Brandy for 26 months.

Appellant Margaret Lee Lindsey testified that when Brandy first came to their home, she would sit and rock herself into complete withdrawal. Appellant stated that Brandy's eyes rolled back in her head and she would chant. Brandy did not react to voices and would sleep for exceptionally long periods of time. Appellant testified as to Brandy's extreme violence with her dolls and the long periods of time between bowel movements and urination. Upon hearing from her older sister, father or mother, Brandy would resort to violence to her dolls. Appellant stated that initially Brandy's emotional condition was such that she would not let her out of her sight for any reason. Appellant often slept in the same room with Brandy. Following any visitation with her mother, Brandy would revert to total withdrawal and begin to chant. This behavior would generally last for up to a week after the visits with her mother. Appellants began therapy with Brandy in February, 1981. Brandy met with her therapist, Jon Lundquist, on a

once-a-week basis and later switched to once every other week for a total period of one year.

Jon Lundquist, a psychiatric social worker, testified that he counseled Brandy who was brought to him by appellants with two disturbing problems. The problems included compulsive masturbation and behavior resembling autistic regression. He testified that he completed his work with Brandy approximately six or eight months before trial. Lundquist stated that appellant Margaret Lindsey had very natural, positive mothering abilities and she followed his instructions well. Much of his information came from Mrs. Lindsey which Brandy corroborated on her own initiative. He recommended that visitation with the natural mother be stopped as he would see Brandy regressing to her autistic patterns and there would also be an increase in masturbation. Lundquist testified that Brandy regressed to a two-year-old, turning inward as a functional protection. Finally, he stated that since visits with Brandy's natural mother had been terminated, there had been no periodic regressive behavior and that if she were permitted contact with appellee, it would send her back into the regressive behavior pattern. It was Lundquist's opinion that appellants had been excellent parents to Brandy, that it would not be in Brandy's best interest to be moved from the home they had provided and that it was not reasonable for appellee to continue to withhold her consent to the adoption.

Dr. Glenn Lowitz, a clinical psychologist employed by Arkansas Children's Hospital, became involved in the case at the request of appellee's attorney and was engaged to observe Brandy and appellee to determine if the inappropriate behavior surrounding Brandy's contacts with her mother were true. He testified that he administered several tests and visited with both Brandy and her mother. Dr. Lowitz interviewed appellee and he testified that her response to his questions as to her immediate and future plans for Brandy focused on her difficult labor and delivery of Brandy and whether or not Brandy still remembered her. He explained that he did not get the kind of information he was looking for in terms of planning for herself, either with or without Brandy nor could he evaluate her responses as

beneficial to future plans which might get appellee in a position where she could take the child. Dr. Lowitz stated that appellee's four attempts at rehabilitation which had failed suggested that her risks of reverting to alcohol in the future were enhanced. He concluded by testifying that he did not think it would be in Brandy's best interests to start to build a relationship with appellee and that it was in Brandy's best interests to have the issue of the direction of her life settled promptly.

Christene Swartz, the maternal grandmother, testified as to appellee's emotional and drug problems. She felt that Brandy had a wonderful home with appellants and that it was best for Brandy to have the adoption go through.

Appellee admitted at trial that she was an alcoholic and a "pillhead." She stated that she had not had a drink in six months and 28 days. Her sole means of support consisted of social security disability income amounting to $274.30 per month and that the housing authority paid half of her rent. Appellee objected to the adoption but did not ask the court to place Brandy with her at that time as she did not have the financial capability to support her. We find the following testimony pertinent:

Q. You don't feel you are in a position to take the child into your home at this time?

A. Financially I'm broke. But I am happy. Happy broke.

Q. Why do you say you are happy broke?

A. Well the feelings you get inside. You know. Having cigarettes, having food, you know. That is all that is important to me. Having clean clothes, you know, right now.

The trial court heard testimony from people well-acquainted with appellants and who had been in their home. Each testified as to the Lindsey's strong marriage, the

fact that they had successfully raised two daughters to maturity, and their love for Brandy.

From a *de novo* review of the record before us, we find that appellants established by clear and convincing evidence that appellee unreasonably withheld her consent to the adoption contrary to Brandy's best interest. The evidence was overwhelming in this regard and there was absolutely no testimony to support any other conclusion. Each of the expert witnesses stated that it was contrary to Brandy's best interest to not have the issue settled and that it was emotionally devastating for Brandy to be in her mother's presence for any period of time. Furthermore, the issue of appellee's fitness, ability and desire to maintain a parental relationship with Brandy was fully developed at trial. While the primary consideration in the case at bar is the welfare of the child, this does not mean that courts can sever the parental rights of nonconsenting parents and order adoption merely because the adoptive parents might be able to provide a better home. Here, however, appellants made a proper showing of appellee's neglect and unfitness as a parent amounting to an unreasonable withholding of appellee's consent to the adoption. Brandy, through appellants' love, support and devotion, has been able to overcome the horrors she was forced to live with for the first four years of her life and it is in her best interest that the petition for adoption be granted. We hold that the probate judge's decision in denying appellants' petition for adoption is clearly erroneous.

Accordingly, we reverse and remand. The trial court is to enter a decree allowing the adoption of Brandy by appellants.

Reversed and remanded.

MAYFIELD, C.J., and CLONINGER, J., agree.