# IN THE MATTER OF THE ADOPTION OF
# ROBERT CRAIG TITSWORTH

CA 84-12

669 S.W.2d 8

Court of Appeals of Arkansas
Division II
Opinion delivered May 2, 1984

*Peel & Eddy,* for appellant.

*Kenneth W. Cowan, Western Arkanss Legal Services,* for appellee.

TOM GLAZE, Judge. This is an appeal from a denial of appellants' petition to adopt Robert Craig Harrison. Appellants contend the probate judge clearly erred (1) in not finding that the mother failed to communicate with or to support the child for a period of one year, or (2) in not finding that the mother unreasonably withheld her consent to the adoption contrary to the best interest of the child. We have reviewed the record and find that the probate judge's findings are clearly against the preponderance of the evidence.

On December 30, 1978, a son, Robert Craig Harrison, was born out of wedlock to appellee Lori Harrison. The appellant father, Robert Titsworth, did not visit or support the child or acknowledge paternity until sometime in June,

1980. Beginning then, Lori took the child to Robert's place of business for visits. In September, 1980, Lori placed the child in the custody of Robert because, according to her testimony, she was having personal and financial difficulties. Since September, 1980, Robert Titsworth has had continuous custody of the child.

Apparently, between December, 1980, and March, 1981, Robert and his wife, appellant Sheila, would not allow Lori to see her son, so she sought and gained visitation privileges in a Pope County Court action. In that same proceeding, Robert was adjudged the natural father and granted custody of the child. Although Lori visited her son at times after the March, 1981, proceeding, she undisputedly had no direct contact with the child between September 16, 1981, and October, 1982. Lori's lack of contact with her son largely resulted from her attempted suicide in October, 1981, and her commitment to the State penitentiary in March, 1982. She testified that she did not see her son after her suicide attempt because she was "just real upset" and "it took me awhile to get myself back together."

In addition, between December, 1981, and August, 1983, the appellee was in jail or the penitentiary for a number of criminal offenses unrelated to this action. However, according to her testimony, she did attempt unsuccessfully to communicate with the appellants and the child, by mail and through the prison chaplain. Appellee testified her letter was returned stamped "not deliverable as addressed to this person," and the chaplain's attempts were rebuffed by appellants.

In their petition to adopt Robert Harrison, the appellants alleged that Lori Harrison had failed significantly, without justifiable cause, to communicate with and to provide for the care and support of Robert Craig Harrison as required under Ark. Stat. Ann. § 56-207(a)(2) (Supp. 1983). In their amended petition, appellants alleged that it was in the best interest of Robert Craig Harrison that appellants be allowed to adopt him and that Lori Harrison was unreasonably withholding her consent contrary to Robert Harrison's best interest. *See* Ark. Stat. Ann. § 56-220(c)(3) (Supp. 1983). In denying the adoption, the probate judge stated that he did

not believe that the evidence was clear and convincing that the mother had failed to communicate with or to support her child without cause as required by law. He made no finding regarding appellants' assertions under § 56-220(c)(3).

We review probate proceedings *de novo* on the record, but it is well settled that the decision of a probate judge will not be disturbed unless clearly erroneous; and we give due regard to the opportunity and superior position of the trial judge to judge the credibility of witnesses. Ark. R. Civ. P. 52(a); *Taylor* v. *Hill,* 10 Ark. App. 45, 661 S.W.2d 412 (1983). Personal observations of the judge are entitled to even more weight in cases involving the welfare of a small child. *Id.* (citing *Wilson* v. *Wilson,* 228 Ark. 789, 310 S.W.2d 500 (1958).

This Court recently has decided four cases involving Ark. Stat. Ann. § 56-207 (Supp. 1983), which provides, in part:

> (a)   Consent to adoption is not required of: . . . (2) a parent of a child in the custody of another, if the parent for a period of at least one [1] year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree. . . .

*See Dodson* v. *Donaldson,* 10 Ark. App. 64, 661 S.W.2d 425 (1983); *McKee* v. *Bates,* 10 Ark. App. 51, 661 S.W.2d 415 (1983); *Taylor* v. *Hill,* 10 Ark. App. 45, 661 S.W.2d 412 (1983); and *Chrisos* v. *Egleston,* 7 Ark. App. 82, 644 S.W.2d 326 (1983). *See also Loveless* v. *May,* 278 Ark. 127, 644 S.W.2d 261 (1983); *Henson* v. *Money,* 273 Ark. 203, 617 S.W.2d 367 (1981); *Pender* v. *McKee,* 266 Ark. 18, 582 S.W.2d 929 (1979); *Harper* v. *Caskin,* 265 Ark. 558, 580 S.W.2d 176 (1979); *Watkins* v. *Dudgeon,* 270 Ark. 516, 606 S.W.2d 78 (Ark. App. 1980); *Brown* v. *Fleming,* 266 Ark. 814, 586 S.W.2d 8 (Ark. App. 1979).

A party seeking to adopt a child without the consent of a natural parent bears the heavy burden of proving by clear and convincing evidence that the parents have failed sig-

nificantly without justifiable cause to communicate with the child or to provide for its care and support for the prescribed period. *Taylor* v. *Hill,* 10 Ark. App. at 47, 661 S.W.2d at 414 (1983) citing *Harper* v. *Caskin,* 265 Ark. 558, 580 S.W.2d 176 (1979).

Appellants contend that the evidence at the hearing showed undisputedly that Lori failed significantly and without justifiable cause to communicate with or to support her child from September of 1981 to October of 1982. They argue further, citing *Zgleszewski* v. *Zgleszewski,* 260 Ark. 629, 542 S.W.2d 765 (1976), that the fact the appellee was in jail or the penitentiary for most of that one-year period does not constitute justifiable cause.

*Zgleszewski* involved the abandonment provision of our prior adoption law, Ark. Stat. Ann. § 56-106 (Repl. 1971), under which consent to adopt was not required of a parent who had abandoned a child for more than six months preceding the filing of the petition. In *Zgleszewski,* the mother and stepfather petitioned to adopt her children without the consent of the natural father, who was in prison in Pennsylvania at the time of the petition. The probate court denied the adoption, and the Supreme Court reversed. The Court noted that between 1969 and 1975, the father had seen his children for only about five minutes at his father's funeral. Although he had saved $1,400 while in prison, he spent none of that to help his children; furthermore, at trial he indicated no intention to help them in the future. After reviewing the record, the *Zgleszewski* court, quoting from *In re Adoption of McCray,* 460 Pa. 210, 331 A.2d 652 (1975), stated:

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child.

The Court found that the father's interest in his children's welfare was minimal and that his "criminal acts and the course of conduct followed thereafter indicate a conscious disregard of the children and an indifference to their welfare tantamount to voluntary abandonment." *Id.* at 632-33, 542 S.W.2d at 768.

In the instant case, appellants were not required to show Lori abandoned her son but only that for at least one year she significantly and without justifiable cause failed to communicate with or support him — a less stringent standard than that required under the earlier adoption code considered by the Court in *Zgleszewski.* However, like the Court in *Zgleszewski,* we believe the facts here clearly demonstrate that Lori's criminal acts and course of conduct indicate a conscious disregard of her child. By her own testimony, Lori committed her first felony when she was bearing Robert Craig, who later was born on December 30, 1978. By February, 1980 — when her son was fourteen months old — Lori had been convicted and entered the penitentiary for her first time. She was discharged in May, 1980, and in either June or July, 1980, she gave physical custody of Robert Craig to his father. In 1981, she admits she again was charged with felony crimes — at least fourteen. She subsequently attempted suicide by cutting her left wrist seven times and her elbow once. She was treated for these injuries in a private hospital; then, she spent a brief time in the State Hospital. Thereafter, she was incarcerated in a county jail for one month and then commenced her second penitentiary term in March, 1982. Lori concedes that she had not communicated with Robert Craig from the time she attempted suicide in October, 1981, until after she was transported from the penitentiary to Pope County on other felonies in October, 1982. Accepting Lori's own testimony as true, her only efforts to contact her son were (1) by a letter that was returned as undeliverable, (2) through the prison's chaplain, who called Robert Craig's grandmother on behalf of Lori "to find out about him . . . but they wouldn't talk to him [the chaplain]," and (3) through her sister, who took some clothes and toys to Robert Craig for Christmas in December, 1981. Based upon Lori's testimony alone as set forth above, we believe she failed significantly and without

justifiable cause to communicate with or support Robert Craig, and as a consequence, we conclude her consent was unnecessary in this adoption proceeding.

Even if we were to conclude that Lori's efforts to communicate with Robert Craig were legally sufficient to require her consent, we believe the evidence clearly establishes that Lori unreasonably withheld her consent contrary to her son's best interest. *See Wineman* v. *Brewer,* 280 Ark. 527, 660 S.W.2d 655 (1983), and *Lindsey* v. *Ketchum,* 10 Ark. App. 128, 661 S.W.2d 453 (1983). Lori argues that the facts presented in *Wineman* and *Lindsey* were worse than those here, and therefore those cases are distinguishable and inapposite. We find no meaningful distinction with respect to the requirements of the statutory provisions in question. Without being too repetitious, we will attempt to summarize the evidence that leads us to this conclusion. Lori first married at the age of fifteen years. That marriage ended in divorce eight months later on July 12, 1976. Sometime thereafter, she and Robert dated; she became pregnant and gave birth to Robert Craig on December 30, 1978. At this time, Lori was eighteen years old. Afterwards, she commenced residing at various places, living in at least eleven different dwellings until her second commitment to the penitentiary in March, 1982. During this period, she relied on friends and acquaintances to help care for Robert Craig. In 1979, she met a man named Louis Horton and married him; she later learned the marriage was invalid. Lori said that she lived with Horton three or four days, at which time he went to the penitentiary; she has not seen him since.

Lori's lifestyle proved detrimental to her son. Mary McKinney, a psychological intern at Human Services in Russellville, testified that she had treated Robert Craig in a children's communication and interaction group between June of 1981 and August of 1982. She described him as "socially maladjusted" with "very aggressive behavior" when she first saw him. McKinney testified that Robert Craig would point and grunt instead of asking for something. She said that he had "delayed speech." He was very disruptive in the group. However, he made good progress,

according to Ms. McKinney. She said that she had the full cooperation of Sheila and Robert Titsworth, who met with her privately to discuss problems and who also attended parenting classes.

Another witness, Ed Williams, who sponsored Lori after she left the penitentiary, testified that Robert Craig's "best interests from a parenting standpoint never seemed to be a part of her thinking as far as her daily routine or her night activities or anything else." Williams related a number of occasions on which she simply failed to properly feed Robert Craig or look after his hygiene requirements. From our *de novo* review of the entire record, we believe the evidence clearly manifests that Lori has largely ignored Robert Craig's interests and at the same time has failed to demonstrate any stability in her own life. Unfortunately, she has shown during her young life that she has a propensity to violate the law, which, in turn, has caused her to serve a great deal of time in jail and the penitentiary — a fact not conducive to raising a child.

For the reasons given above, we reverse and remand.

Reversed and remanded.

MAYFIELD, C.J., and CLONINGER, J., agree.