2012 Ark. App. 316

**D.L.R., Appellant**

v.

**N.K. and C.K., Appellees.**

**No. CA 11–950.**

Court of Appeals of Arkansas.

May 2, 2012.

Vandell Bland, Sr., Forrest City, for Appellant.

Glenn E. Kelley, Kelley Law Firm, Rogers, for Appellees.

DOUG MARTIN, Judge.

Appellant D.L.R. appeals from the February 25, 2011 decree of adoption, entered by the Mississippi County Circuit Court, that granted the petition for adoption filed by the appellees, N.K. and C.K., whereby appellees adopted a baby girl born to D.L.R. and his then-wife, T.W.[1] On appeal, D.L.R. contends that the circuit

---

1. T.W. is not a party to this appeal.

court erred in finding that he was a parent not having custody and that he was unreasonably withholding his consent to the adoption. We find no error and affirm.

D.L.R. married T.W. on May 4, 2004. On May 8, 2008, T.W. gave birth to a baby girl, K.R.[2] T.W. initially put K.R. up for adoption in June 2008 with D.L.R.'s acquiescence, but when the adoption agency was unable to find a placement to T.W.'s liking, she withdrew her consent. In July 2008, T.W. again placed the baby for adoption with a different agency, and K.R. was placed with appellees that same month. T.W. signed a "Consent to Adoption, Waiver of Notice, and Consent to Guardianship" on July 18, 2008, and the appellees filed a petition for adoption in Benton County Circuit Court[3] on July 21, 2008. A first amended petition for adoption, filed on August 27, 2008, alleged that D.L.R. had refused to sign a consent to the adoption, which was not in the child's best interest.

D.L.R. filed an answer to the petition for adoption on September 10, 2008, denying that the adoption was proper. After a period of discovery, during which time K.R. remained in the custody of the appellees, the circuit court held a hearing on the adoption petition on October 8, 2010.[4] Following that hearing, the circuit court issued a detailed letter opinion in which it found that D.L.R. was a parent not having custody within the meaning of Arkansas Code Annotated section 9–9–220(c)(3) (Repl.2009); that D.L.R. was unreasonably withholding his consent to the adoption; and that the adoption was in the best interest of the child.

The circuit court entered its decree of adoption on February 25, 2011. D.L.R. filed a timely notice of appeal on March 18, 2011, and now argues on appeal that the circuit court's decision was not based on clear and convincing evidence that he was a parent "not in custody" of the child.[5]

As just noted, the trial court in this case ordered termination of D.L.R.'s parental rights pursuant to Arkansas Code Annotated section 9–9–220(c)(3) (Repl. 2009), which authorizes a trial court to order termination where a parent who does not have custody unreasonably withholds consent to adoption. The facts warranting termination of parental rights must be proved by clear and convincing evidence. *Henderson v. Callis*, 97 Ark. App. 163, 245 S.W.3d 174 (2006). In reviewing the trial court's evaluation of the evidence, this court will not reverse unless the trial court's findings are clearly erroneous. *Id.* (citing *Crawford v. Ark. Dep't of Human Servs.*, 330 Ark. 152, 951 S.W.2d 310 (1997)). Clear and convincing evidence is that degree of proof which will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Id.* Furthermore, this court will defer to the trial court's evaluation of the credibility of the witnesses. *Id.*

---

2. D.L.R. and T.W. had three other children together: a set of twins who were born in December 2005 and given up for adoption with both parents' consent, and a boy born in March 2007. When the couple divorced in 2008, T.W. obtained custody of that child pursuant to the divorce decree. T.W. also had five other children from previous marriages.

3. The adoption agency, American Adoptions, Inc., was located in Benton County. The case was subsequently transferred to Mississippi County, where D.L.R. and T.W. lived.

4. We note that, although the transcript of that hearing is 211 pages long, D.L.R.'s abstract consists only of four pages. The appellees have submitted a 73–page supplemental abstract that cures the glaring deficiencies in D.L.R.'s abstract.

5. D.L.R. does not challenge the trial court's finding that the appellees are fit to raise K.R.

Section 9–9–220 provides a mechanism by which a parent may relinquish his or her parental rights or a court may terminate parental rights. Specifically, section 9–9–220(c)(3) provides that,

> (c) In addition to any other proceeding provided by law, the relationship of parent and child may be terminated by a court order issued under this subchapter on any ground provided by other law for termination of the relationship, or on the following grounds:
>
> . . . .
>
> ₄(3) That in the case of a parent not having custody of a child, his or her consent is being unreasonably withheld contrary to the best interest of the child.

Neither the pertinent statutes nor Arkansas case law appears to provide a clear definition of "custody," insofar as the adoption statutes are concerned; however, *Black's Law Dictionary* defines the term as "[t]he care, control, and maintenance of a child awarded by a court to a responsible adult. Custody involves legal custody (decision-making authority) and physical custody (caregiving authority), and an award of custody usu. grants both rights." *Black's Law Dictionary* 441 (9th ed.2009). "Legal custody" is then defined as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare," *id.* at 442, and "physical custody" is defined as "[t]he right to have the child live with the person awarded custody by the court." *Id.* at 1263. *See also In re Adoption of Baby Boy B,* 2012 Ark. 92, at 15, 394 S.W.3d 837, 845–46 (Danielson, J., concurring) (citing *Black's Law Dictionary* for a definition of custody).

At the hearing on the adoption petition, D.L.R. testified that he was twenty-five years old and lived with his parents, both

presently and "off and on" during his marriage to T.W. D.L.R. said that his marriage to T.W. was troubled and that the "whole marriage" was "back and forth" to his parents' house. D.L.R. acknowledged that, during the marriage, he and T.W. got into physical fights, one of which led to his being charged with domestic battery and ordered not to have any further contact with her. While T.W. was pregnant with K.R., D.L.R. said that he worked "off and on" at temporary jobs. He contended that he contributed about $200 a month, "when [he] had it," to help T.W. pay for rent and groceries.

₅Regarding the first attempt at adoption, D.L.R. claimed to have had no prior knowledge that T.W. was going to put the baby up for adoption. He testified that he found out about it when, after an argument, he went to his parents' house, and when he returned home, the baby was gone. At that time, D.L.R. and T.W. went to pick the baby up together and brought her back to Osceola. As for the second attempt (the one in which K.R. was placed with the appellees), D.L.R. said that he and T.W. had been arguing and he had left the marital home again.

After the baby had been placed for adoption again, D.L.R. and his parents hired an attorney, and his parents initiated a guardianship proceeding. When asked whether he thought it was in K.R.'s best interest for his parents to be the child's guardian, D.L.R. replied, "Well, it's the best interest of me." He also acknowledged that it was his intent, had the guardianship petition been granted, for his parents to raise K.R.

D.L.R. further admitted that he had "a number of criminal offenses" throughout the years,[6] including a conviction for do-

---

**6.** Court records introduced during the hearing showed that D.L.R. had pled guilty, at

mestic battery arising out of his fight with T.W., and that he had been in jail from June 9, 2008, through September 28, 2008, as a result of the domestic-battery conviction. Although D.L.R. claimed that he supported T.W. and K.R. after the baby was born, he acknowledged that he was not employed at that time and had no records to indicate what type of support he had provided. He also conceded that he had ₆neither had nor sought visitation with the child since June 2008, when the child was barely one month old.

T.W. also testified at the hearing, stating that there were problems in her marriage to D.L.R., including excessive drinking and physical abuse. At the time T.W. became pregnant with K.R., D.L.R. was not living in the marital home full time, and she said that the "in and out" nature of his residency had existed "pretty much since the beginning of [their] marriage." Sometimes D.L.R. would move in with his parents for weeks at a time, T.W. said.

T.W. testified that, during her pregnancy, she discussed adoption with D.L.R. and told him that she could not "handle" having another baby. She acknowledged that D.L.R.'s parents had taken the baby to the doctor on one occasion and kept her a "few times," but she denied that D.L.R.'s parents kept K.R. for extended periods of time. T.W. stated that, at the time she signed the consent to adoption, K.R. was in her custody and possession, and there was never a time when she released the baby to D.L.R.'s custody. T.W. further said that, when she first approached D.L.R. about the adoption, he "seemed okay with it" but changed his mind after speaking with his parents. Moreover, at the time she gave K.R. up, D.L.R. was not living in the house with her.

In its findings of fact, the circuit court noted that the evidence was undisputed that D.L.R. and T.W. did not live together after June 9, 2008, and that D.L.R. had neither physical nor court-ordered custody of K.R. after that time. Moreover, since July 31, 2008, K.R. had been in the sole custody of the appellees. For the period of time from the baby's ₇birth in May 2008 until June 9, 2008, the court noted that D.L.R. "lived as much with his parents ... as he did with T.W." After the baby's birth, D.L.R., according to his own testimony, "left the marital home on a number of occasions because of disagreements with T.W.," and when he left the home, he left the baby with T.W. Emphatically rejecting D.L.R.'s argument that he was a parent with custody solely because he was her biological father, the court wrote as follows:

> Since June 9, 2008, [D.L.R.] has not seen [K.R.], he has not attempted contact with her, he has not requested contact with her prior to October 8, 2010, and he has not contributed to her support and maintenance. Between June 9, 2008 and July 18, 2008, [K.R.] was in the sole physical custody of [T.W.]. Since July 31, 2008, [K.R.] has been in the sole physical custody of [the appellees]. During the period of June 9, 2008 to July 21, 2008, [D.L.R.] had neither actual physical custody nor court-ordered custody of [K.R.]. At the time of the filing of the Petition for Adoption on July 21, 2008, [D.L.R.] did not have physical custody or court-ordered custody of [K.R.]. During the period of July 21, 2008 to October 8, 2010, [D.L.R.] had neither actual physical custody nor court-ordered custody of [K.R.].

various times, to one count of criminal use of a prohibited weapon; one count of fraudulent use of a credit card; one count of third-degree domestic battery, second offense; and four counts of violation of the Arkansas Hot Check Law.

[D.L.R.] contends he was a parent in custody of [K.R.] solely because he is her biological father and was married to [T.W.] at the time of the filing of the Petition for Adoption. Custody in a general sense is defined by *Black's Law Dictionary*, 4th Edition "as the care and possession of a thing, and carries with it the idea of the thing being within the immediate personal care and control of the person to whose custody it is subjected; charge; immediate charge and control ..., implying responsibility for the protection and preservation of the thing in custody," citing *Southern Carbon Co. v. State*, 171 Misc. 566, 13 N.Y.S.2d 7, 9 [ (N.Y.Ct.Cl.1939) ]. *Black's Law Dictionary* and the New York Court were defining custody as it related to "a thing" and not a young living child, yet one having custody of a young child owes a much greater duty and responsibility to "keep, guard, care, watch, inspect, preserve or secure" a child than some thing.

[D.L.R.] asserts his right of custody of [K.R.], yet he failed to accept and perform his duty and responsibility as a custodial parent in "keeping, guarding, caring, watching, inspecting, preserving and securing" the health, safety and welfare of [K.R.]. [D.L.R.] cannot point to any act taken by him that is evidence that he stepped forward to take on the parental role of providing the necessities of life required for the health, safety, and welfare of [K.R.]. The evidence is that [D.L.R.] walked away without providing for the child and with little concern whether anyone |₈else was providing for [K.R.]. [D.L.R.] abdicated all parental responsibilities owed to [K.R.].

The court [therefore] finds that [D.L.R.] is not a parent having custody of [K.R.] within the meaning of Ark. Code Ann. § 9–9–220(c)(3).

D.L.R. argues on appeal that the trial court's findings of fact and conclusions of law were not supported by the evidence, and he asserts that he was "definitely a custodial parent." He contends that, "if a man is married and leaves home for less than a week, his wife does not have a right to give his child to an adoption agency without his consent." The evidence introduced at the hearing, however, belies D.L.R.'s arguments. There was an abundance of evidence that, for the four or so weeks between K.R.'s birth on May 8, 2008, and June 9, 2008, the date on which he does not dispute that he left the marital home, he lived at his parents' house nearly as much as he did with his wife, and during those times that he returned to his parents' home, he left the baby with T.W. As the trial court also noted, by D.L.R.'s own testimony, he had contributed very little financially to K.R.'s care, given that he had no income for most of 2008.

In making a decision of whether to terminate the parental rights of a party, the trial court has a duty to look at the entire picture of how that parent discharged his duties as a parent, the substantial risk of harm the parent imposed, and whether or not the parent was unfit. *In re Adoption of K.M.C.*, 62 Ark.App. 95, 969 S.W.2d 197 (1998); *Waeltz v. Ark. Dep't of Human Servs.*, 27 Ark.App. 167, 768 S.W.2d 41 (1989). Moreover, while it is well-settled that termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents, parental rights will not be enforced to the detriment or |₉destruction of the health and well-being of the child. *Anderson v. Douglas*, 310 Ark. 633, 839 S.W.2d 196 (1992). We affirm the circuit court's thorough and well-stated decision on this issue.

As noted above, D.L.R.'s argument on appeal is directed to whether the circuit court erred in finding that he was a parent

not having custody. He asserts that, "because [he] was a custodial parent, the question of best interests is not reached." In so doing, D.L.R. cites *Lindsey v. Ketchum,* 10 Ark.App. 128, 661 S.W.2d 453 (1983), for the proposition that "any evidence having probative value as to the present or prospective fitness of a parent is admissible to determine whether consent has been unreasonably withheld." He makes no argument, however, that the trial court erred in finding that he unreasonably withheld his consent, nor does he point to any evidence that would have supported a contrary result. For that reason, we decline to raise or discuss this issue on appeal. *See, e.g., Renfro v. Ark. Dep't of Human Servs.,* 2011 Ark. App. 419, 385 S.W.3d 285 (noting that the appellate courts will not develop a party's arguments for him).

Affirmed.

ROBBINS and HOOFMAN, JJ., agree.