2011 Ark. App. 688
**Elizabeth Suttles PUTT, Appellant**
v.
**Lance Edward SUTTLES, Appellee.**
**No. CA 11–330.**

Court of Appeals of Arkansas.

Nov. 9, 2011.

Melissa Bristow Richardson, Jonesboro, for appellant.

Scott Allen Emerson, Jonesboro, for appellee.

CLIFF HOOFMAN, Judge.

Appellant Elizabeth Suttles Putt appeals from the trial court's decision awarding a change of custody of the parties' two children to appellee Lance Suttles. On appeal, appellant argues that the trial court erred (1) in denying her request for DNA testing to determine the paternity of her eldest child, and (2) in awarding custody to appellee. We affirm.

The parties to this appeal were married in October 1998 and were divorced pursuant to a decree entered on February 1, 2010. A separation and property-settlement agreement was incorporated into the decree. This agreement provided that the parties would share joint custody of the parties' two children, G.S.1 (born 12/15/03) and G.S.2 (born 5/23/05), and that all child-related expenses would be split equally, with neither party to pay child support.

On August 27, 2010, appellee filed a petition to modify custody, alleging that there had been a material and substantial change in circumstances since the entry of the divorce decree, due to appellant's remarriage to her current husband, who had since pled guilty to domestic assault and battery charges against appellant. Appellee also alleged that the children had witnessed verbal altercations and abuse between appellant and her husband and that this environment was not appropriate for the children. Appellee asserted that he had a stable home and a stable job that would be conducive to raising the children and prayed that he receive custody and that appellant be required to pay child support.

Appellant filed a response to the petition, denying all of appellee's allegations, and also filed a counterclaim. In her counterclaim, appellant alleged that there had

been a material change of circumstances and that it would be in the children's best interest for custody to be awarded to her, because she had remarried and was now a stay-at-home mom. She alleged that appellee had caused problems between her and her husband and also that appellee was not financially responsible and owed her money for child-related expenses. Appellant further requested that the court order appellee to submit to DNA testing to determine the paternity of G.S.1. In appellee's reply to the counterclaim, he denied the allegations and also asserted that appellant's request for paternity testing was barred by waiver, res judicata, and collateral estoppel.

Hearings were held on the petition and counterclaim on October 20 and December 9, 2010. After preliminary argument by counsel, the trial court first addressed appellant's request for paternity testing and stated that it did not have authority to grant DNA testing because the issue of paternity was barred by res judicata and also noted that disaffirmance of |₃paternity at that point would be contrary to public policy.

The first witness to testify at the hearing was appellee. He stated that under the parties' joint-custody agreement, he had the children on alternating weekends and Thursdays, as well as every Wednesday night, and that he had always picked up the children from school on those days. However, appellee testified that since the children started back to school in the fall, he would arrive at school to pick up the children only to find out that appellant and her husband had already picked them up. Appellee would have to then arrange to meet them later to exchange the children. He further stated that he was unable to communicate directly with appellant regarding the children, because she had blocked his phone number from her cell phone. Appellee testified that he now had

to contact her through her husband's phone. He testified as to the unstable nature of appellant's current marriage to John Putt and stated that, since she married him on February 16, 2010, appellant had separated from him and had even filed a petition for divorce and for a restraining order in March 2010, only to reunite with him in July. Appellee indicated that it was since July that he was unable to call appellant directly or to pick up his children from school. He stated that he was very distressed that he could not communicate with appellant or his children on a regular basis as he had before appellant reunited with Putt. Appellee testified as to verbal altercations that had occurred between him and Putt, where Putt had screamed insults and obscenities at both him and appellant in the children's presence. He also testified that his children had sometimes returned with bruises and scratches after being with appellant and Putt and that appellant had told him that, on one occasion, Putt chased after one of the |₄children in a store and grabbed him, causing a bruise. In addition, appellee stated that Putt had sent him inappropriate texts about his and appellant's sexual relations. Appellee testified that his children call Putt "the bad man," because appellant had referred to him as such.

According to appellee, he wished to have custody of his children because he did not want them to be in that environment due to his concern for their safety. He testified that he was employed as a police chief and that he still lived in the parties' marital home. He further stated that he had a very good relationship with appellant's family, in contrast with appellant since her remarriage, and that the children would be able to remain in contact with their grandparents and other family if they were in his custody. Appellee testified that his work schedule was flexible enough to allow him to care for the children and that he

also would have support from family who live nearby. He admitted that he had experienced some financial problems recently but stated that he was resolving these issues and that he would be able to support his children if he were awarded custody.

In her testimony, appellant admitted that she and Putt had a relationship prior to her divorce from appellee. She also admitted that it had been a tumultuous relationship in the past and that she had even requested an order of protection against Putt, which was then dismissed when they were married in February 2010. Appellant testified that she had requested the order of protection after Putt locked her in the bathroom and physically restrained her from leaving his home, leaving bruises on her chest and arms. She admitted that she was afraid of Putt at the time of that incident but stated that appellee and her mother had convinced her to file the order. Appellant also admitted that she had filed for divorce from Putt in March 2010, approximately one month after they married, and that a restraining order was filed at that time. She further testified that she had requested that the police charge Putt with assault after an incident in June 2010, where he had blocked her path with his vehicle when her youngest son was present. However, appellant claimed that it was interference from appellee and her family that was to blame for her unstable relationship with Putt and stated that, since she had reunited with him in July 2010, they were undergoing counseling at their church and had a good relationship. She did admit that the police were called in September, when she ran to her neighbor's home wearing only a towel after an argument with Putt, but stated that she and Putt had just needed to "cool off." Appellant stated that she had limited her contact with appellee and her family because she and Putt had agreed that this was better for their marriage. She testified that she should have custody of the children because she now had a stable home and marriage, she was able to be a stay-at-home mother if she chose, and she took the children to church and Sunday school regularly. She denied that her children were scared of Putt, claiming that they usually chose him to help with homework or to play with them, and stated that it was appellee who had told the children that Putt was a "bad man."

Appellant's parents testified on behalf of appellee and stated that he should have custody of the children. They also testified that their daughter and Putt had separated several times and that Putt had sent them threatening and inappropriate texts. According to appellant's mother, she was concerned about the safety of her daughter and grandchildren, due to Putt's repeated incidents of controlling and abusive behavior. She further testified that her relationship with appellant was now strained, that they had very little contact since appellant resumed her relationship with Putt, and that she does not get to see her grandchildren very often unless it is through appellee. Appellant's parents further testified that Putt had made an obscene gesture toward them outside the courtroom that day.

Appellee's niece, Jodie Griffin, testified that when appellant and Putt were separated, appellant told her that she had instructed her children to run, yell, or draw attention to themselves if they saw Putt at school or out somewhere because she was concerned about their safety. Griffin further stated that appellant's counselor had told her to get away from Putt because of his controlling, compulsive personality. Griffin testified that appellee is a wonderful father and that she has a close relationship with the children. However, she stated that she had not been allowed to see

the children lately when appellant had custody.

Putt also testified and admitted that he had engaged in inappropriate behavior by sending lewd pictures and texts to appellee and appellant's family. He explained that he only did so because he was hurt and angry at them for interfering with his relationship with appellant and that he was embarrassed by much of his behavior. He also admitted to pleading no contest to domestic assault and battery charges brought by appellant, but he denied any wrongdoing in connection with these incidents. Putt explained that he did not leave bruises on appellant by physically restraining her; rather, he was only trying to keep her from leaving and "her walkin' into my hands put" the bruises on her. He testified that appellee was blocked from calling appellant's phone in order to protect his family, and he compared this type of restriction to an anti-virus program for a computer or to parental controls on a television. Putt also denied making any sort of crude gesture toward appellant's family at the hearing.

Appellant's church counselor, Mike Hart, also testified on her behalf, stating that she and Putt had improved their communication skills through counseling and that they were now providing a "good solid home" for the children. Hart further testified that he would not have any reservations about having his own children in that home environment.

After hearing all of the evidence, the trial court found that the joint-custody arrangement was not working and that primary custody should be awarded to one of the parties. The court found that Putt had "engaged in a deliberate pattern of parental alienation" against appellee, that he had enlisted appellant's assistance in that campaign, and that Putt had made it clear that he was going to control how appellee could contact his children, which is "grossly inappropriate." The court also found that appellant and Putt had attempted to damage appellee's relationship with his children. The court further noted that appellant was now estranged from her own family, that her family spoke highly of appellee, and that appellee would do a better job of promoting family relationships with all parties. Thus, the trial court found that custody should be changed to appellee and that appellant should receive visitation and pay child support. An order to this effect was entered on January 7, 2011, and the trial court also noted in the decision that appellant's request for paternity testing was denied. Appellant has timely appealed from this order.

Appellant argues in her first point on appeal that the trial court's denial of her request for DNA testing to determine the paternity of her oldest child was erroneous. During her testimony at the hearing, she testified that she and appellee were separated for approximately one year during their marriage and that she became pregnant with G.S.1 during that year. She asserts that the trial court's reasons for the denial of the DNA testing, which were the doctrine of res judicata and public-policy considerations, should not apply in this case.

As appellant contends, there are two facets to the doctrine of res judicata: issue preclusion and claim preclusion. *Hardy v. Hardy*, 2011 Ark. 82, 380 S.W.3d 354. In cases such as this one, which involve the same subject matter and the same parties as in the previous suit, the claim-preclusion aspect of res judicata may be applied. *Id.* The five elements necessary to bar relitigation of a claim are as follows: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) the first suit was fully contested in good faith;

(4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies. *Id.*

Appellant argues that three of these elements are not met here because the issue of paternity was never raised or contested in the divorce case, as it was in *Hardy,* and because the divorce decree did not mention this issue. However, this argument ignores the fact that the claim-preclusion aspect of res judicata not only bars claims that were actually litigated in the first suit but also bars claims that *could* have been litigated. *Lindsey v. Green,* 2010 Ark. 118, 369 S.W.3d 1; *Martin v. Pierce,* 370 Ark. 53, 257 S.W.3d 82 (2007); *State Office of Child Support Enforcement v. Williams,* 338 Ark. 347, 995 S.W.2d 338 (1999); *McGee v. McGee,* 100 Ark.App. 1, 262 S.W.3d 622 (2007). As the trial court stated in denying appellant's request, there is a long line of cases applying the doctrine of res judicata to bar relitigation of the issue of paternity when it was established under a divorce decree. *See, e.g., Martin, supra; Williams, supra; McCormac v. McCormac,* 304 Ark. 89, 799 S.W.2d 806 (1990); *McGee, supra; Benac v. State,* 34 Ark.App. 238, 808 S.W.2d 797 (1991).

In this case, appellant filed for divorce, and appellee did not contest it. The divorce decree approved and incorporated the parties' separation and property-settlement agreement, which stated that "the parties have two (2) minor children," listed their names and birth dates, which occurred during the marriage, and provided that the parties would have joint custody of the children. The agreement also set out custody and visitation schedules and provided that all expenses would be split equally between the parties. Further, the agreement stated that "the parties shall enjoy shared parenting as much as possible and share jointly the parental responsibilities and privileges arising from the care of the minor children." Thus, the issue of paternity was decided in the divorce decree. *See Martin v. Pierce, supra* (holding that father failed to contest any issue during divorce proceedings and that paternity was established in divorce decree, which stated that children were born of the marriage); *see also McCormac, supra* (mother's subsequent challenge to child's paternity barred by res judicata where parties' pleadings and property settlement stated that there was one child born of the marriage). Both parties were represented by counsel during the divorce proceedings, and appellant had a full and fair opportunity to raise the issue of paternity, as she was fully aware at that time of the facts giving rise to her later request for DNA testing. *McGee, supra.* The fact that the parties' divorce occurred without an adversarial hearing is of no consequence, as res judicata is also applicable to settlement agreements approved by the court and to consent judgments, such as in this case. *Crooked Creek, III, Inc. v. City of Greenwood,* 352 Ark. 465, 101 S.W.3d 829 (2003). Therefore, the trial court's denial of appellant's request for paternity testing on the basis of res judicata was not erroneous.

As the trial court noted in its ruling on this issue, there are also public-policy considerations behind the application of res judicata to issues involving paternity. Although Lord Mansfield's Rule has been abolished and testimony is now allowed by a mother, father, and putative father concerning the paternity of a child, there remains a strong presumption as to the legitimacy of a child born during the marriage. *R.N. v. J.M.,* 347 Ark. 203, 61 S.W.3d 149 (2001) (citing *Leach v. Leach,* 57 Ark.App. 155, 942 S.W.2d 286 (1997)). Therefore, under Ark.Code Ann. § 16–43–901, the trial court is given discretion in divorce cases on whether to order paterni-

ty testing and is instructed to consider the child's best interest before ordering a test that could forever change a child's life, "merely because the adults who caused such a tumultuous situation are curious to know the results of their infidelity." *R.N.*, 347 Ark. at 214, 61 S.W.3d at 155.

Appellant argues that policy considerations should favor DNA testing in this case so that the child's true genetic make-up can be determined and asserts that this was the reason for the request, not to "strip appellee of his parental rights to the child." However, appellant did not raise this argument in her counterclaim or at the hearing when the trial court ruled on her request, and her claim is therefore not preserved for our review. *Taylor v. Taylor*, 369 Ark. 31, 250 S.W.3d 232 (2007). Even if this argument had been preserved, appellant's asserted reason on appeal for requesting the paternity testing is suspect at best, as she first raised this issue in her response to appellee's petition for custody, and she specifically requested that "paternity" of the child be determined. In any event, as the court in *Martin, supra,* recognized, an interest in a child's genetics does not outweigh the financial and emotional welfare of the child and the preservation of an established parent-child relationship. The trial court was thus correct in denying appellant's request, and we affirm on this point.

In her second point on appeal, appellant contends that the trial court erred in awarding custody to appellee. This court reviews child-custody cases *de novo* and will not reverse a circuit court's findings unless they are clearly erroneous. *Gibson v. Gibson*, 2010 Ark. App. 741, 2010 WL 4327099. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been committed. *Id.* Because the question of whether the trial court's findings are clear-ly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest. *Id.* In fact, there are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children. *Id.*

Appellant argues that the trial court erred in admitting and relying on evidence that predated the parties' divorce decree of February 1, 2010, in its award of custody to appellee. Custody will not be modified unless it is shown that there are changed conditions demonstrating that a modification is in the best interest of the child. *Vo v. Vo*, 78 Ark.App. 134, 79 S.W.3d 388 (2002). A party seeking to modify custody must prove that a material change of circumstances has occurred since the last order of custody or that material facts existed at the time of the decree that were unknown to the court. *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001). However, as appellant contends, our supreme court has recently held that this exception for facts unknown by the trial court at the time of the initial custody order does not apply to situations where the parties are fully aware of the circumstances and enter into an agreement that is approved by the court. *Orantes v. Orantes*, 2011 Ark. 159, 381 S.W.3d 758. Thus, appellant is correct that circumstances known by the parties when they enter into a custody agreement cannot be the basis for finding that a material change in circumstances has occurred. *Id.* Also, in order to avoid the relitigation of factual issues already decided, the trial court will typically restrict evidence to facts arising since the prior order. *Id.*

While appellant is correct that the modification of custody in this case had to

be based on a change in circumstances occurring after the divorce decree was entered, there was sufficient postdecree evidence presented to support the trial court's decision to change custody here. The parties had agreed on a joint-custody arrangement, which is disfavored in Arkansas. *Word v. Remick,* 75 Ark.App. 390, 58 S.W.3d 422 (2001). The mutual ability of the parties to cooperate in shared decisions concerning the welfare of the children is essential to support an award of joint custody, and where the parties have fallen into such discord as to render them unable to cooperate in this manner, this in itself can be sufficient evidence of a material change in circumstances to support a modification of custody. *Id.* The trial court in this case expressly found that the parties' joint-custody arrangement did not work and that custody should be awarded to one of the parties. Thus, the trial court then correctly engaged in a determination of the children's best interests to decide which party should receive custody. *See Lewellyn v. Lewellyn,* 351 Ark. 346, 93 S.W.3d 681 (2002).

Although there was some evidence admitted by the trial court that predated the decree, no reversible error occurred here due to the admission of this evidence. The protective order obtained by appellant against Putt was filed prior to the divorce decree, but it was not dismissed until after the decree was entered. Also, the lewd picture and text messages that predated the decree were mostly cumulative of other, similar evidence that occurred postdecree and were admitted without objection by appellant. The trial court did limit the admission of this pre-decree evidence, and as appellee asserts, much of it that was admitted was relevant to impeach the credibility of appellant and Putt. Further, appellant cannot demonstrate prejudice from the admission of this pre-decree evidence, as there was clearly evidence to support the trial court's finding that a material change in circumstances had occurred since the decree such that joint custody was no longer an option. Appellee testified that he could not communicate with appellant or his children without going through Putt because his phone calls were being blocked, that he was no longer able to pick up the children from school, and that he was no longer kept informed of the children's doctor's visits. This postdecree evidence showed that the parties were not able to cooperate in decisions regarding the children and that a joint-custody arrangement was no longer appropriate.

The evidence also supports the trial court's award of custody to appellee. The court found that appellant and Putt had deliberately attempted to alienate the children from their father, that Putt had exerted control over the children's communication with their father, which the court found to be "grossly inappropriate," and that appellee would do a better job of being inclusive and promoting family relationships with extended family. Therefore, the trial court's decision to award custody to appellee was not clearly erroneous, and we affirm on this point as well.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.