

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-13-l87

| | |
|---|---|
| | **Opinion Delivered** October 30, 2013 |
| GRAHAM GOODLOE<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION |
| V. | [NO. DR-10-437] |
| MARCIA GOODLOE<br>APPELLEE | HONORABLE VANN SMITH, JUDGE |
| | REVERSED |

**WAYMOND M. BROWN, Judge**

Appellant appeals from the circuit court's denial of his motion to change custody of his two minor children from appellee to himself.[1] On appeal, appellant argues that the circuit court erred in not granting appellant physical custody when it found a material change in circumstances and changed educational decision-making authority for B.G. and T.G., and medical decision-making authority for T.G., from appellee to appellant. We reverse.

Appellant and appellee were divorced by consent divorce decree on September 9, 2010. Appellee was awarded primary physical custody of the two minor children: B.G., a six-year-old girl, who attended Episcopal Collegiate School (Episcopal), and T.G., a four-year-old boy who was later diagnosed with autism and attended Access Schools (Access) because

---

[1]In response to appellee's motion for contempt, appellant counterclaimed for contempt, an expedited hearing, and for a change in custody.

of his diagnosis.[2] Though the decree permitted appellant to have input on important matters affecting the children, including but not limited to health care and education matters, appellee was awarded legal custody as well, therefore, appellee's decisions would control.

On March 27, 2012, appellant filed a motion for change of custody.[3] In support of his argument for changed circumstances, among other statements, appellant stated that (1) appellee allegedly kept the children up all night while appellee drank and used drugs with her friends; (2) B.G. was absent so many days from school during the 2011–2012 school year that the school made a report thereof to the Arkansas Department of Human Services and B.G. might be required to repeat kindergarten; (3) B.G. was sent to school on January 10, 2012, with a piece of glass in her foot; and (4) T.G. was absent so many days that he was in jeopardy of losing his slot at Access which required 90% attendance. The circuit court issued an ex-parte order in appellant's favor on the same date and ordered both parties to take drug tests.

Following an April 4, 2012 hearing on appellant's motion, during which the court learned that both parties passed the court-ordered drug tests, the circuit court found that an emergency did not exist and set aside its ex parte order.[4] In its order, dated April 25, 2012,

---

[2]T.G. was diagnosed with autism after the divorce in January 2011.

[3]Appellant also moved for an ex parte order to that effect and emergency custody.

[4]The court noted that appellant's motion for ex parte relief was based primarily on the affidavit of Jacqueline Headlee, who had made serious allegations against appellee, but Ms. Headlee did not appear at the hearing. Headlee's affidavit leveled allegations of drug use and having drug dealers in the home of appellee. The circuit court continued the hearing so that it could have Ms. Headlee before it. At the continued hearing, the court found that Ms. Headlee was not credible.

the circuit court reserved the issue of child custody for a final hearing on the merits of the matter.

On May 8, 2012, a meeting was held with staff at Access, appellant, and appellee. During that meeting, Access informed appellant and appellee that T.G.'s aggressive behavior was increasing as was the amount of time being spent one-on-one with T.G. They recommended that T.G. see a psychiatrist and start a medical plan. Appellee took no action on Access's recommendations.

On May 21, 2012, T.G. was suspended from Access for escalating aggressive behavior pending the start of a medical plan. Both appellant and appellee were told that T.G. would not be allowed to return to Access until a medical plan was in place. Again, appellee took no action.

Appellant set up multiple appointments with Dr. Eldon Schulz, one of the doctors who diagnosed T.G. with autism. Those appointments were scheduled during times appellee had T.G. Appellee failed to take T.G. to the appointments, so appellant took T.G. to Dr. Schulz on June 20, 2012, during his scheduled visitation. Dr. Schulz prescribed Clonidine for T.G. A meeting with appellant, appellee, and staff at Access was held the day after T.G.'s appointment with Dr. Schulz on June 21, 2012. At that meeting, appellant informed Access and appellee of the details of T.G.'s appointment with Dr. Schulz, including T.G.'s new prescription. At the close of the meeting, as a result of T.G.'s having a medical plan in place, appellant and appellee were informed that T.G. would be allowed to return to Access, effective July 2, 2012.

3

On June 25, 2012, appellee filed a motion for contempt against appellant because he took T.G. to Dr. Schulz, allegedly without her knowledge, and had given T.G. medicine over her objection. In her motion for contempt, appellee alleged that T.G. was being treated for his autism by Dr. Carlton Burge, that appellant knew T.G. was being treated by Dr. Burge, and that Dr. Schulz's treatment was in conflict with the current regimen of Dr. Burge. Appellant responded in a June 28, 2012 filing that he had never been consulted or given any information regarding Dr. Carlton Burge and that he notified appellee of his intent to take T.G. to Dr. Schulz. He also counterclaimed for contempt due to appellee's failure (1) in the five weeks that had passed since T.G.'s dismissal from Access, to schedule an appointment so that a medical plan could be started as was necessary for his return to Access; (2) to take T.G. to the appointments appellant had previously set, necessitating his action in taking T.G. to see a psychiatrist; (3) to take T.G. to outpatient occupational and speech therapy sessions at Access, during the same five-week time period since May 22, 2012; (4) to consult appellant on T.G.'s treatment; and (5) to allow appellant to communicate with the children when they were in her care.

T.G. did not return to Access on July 2, 2012, as discussed at the June 21, 2012 meeting. Instead appellee sent an email to Ms. Smith, preschool director at Access, notifying her that she did not want T.G. to attend Access. On July 3, 2012, appellant filed an amended counterclaim in which he asserted additionally that appellee withdrew T.G. from Access without his knowledge and that appellant had been notified by Episcopal that B.G. would have to repeat kindergarten.

SLIP OPINION

After a hearing on the parties' motions on July 10, 2012, the circuit court ordered, from the bench, that T.G. should continue receiving treatment from his current physicians and therapist, that appellant and appellee should follow the doctors' recommendations, and that T.G. was to attend Access. The issue of custody was reserved for the final hearing. An order to the same effect was entered on August 9, 2012.

A final hearing on the merits of the custody issue was held on September 20 and 21, 2012. At the hearing's close, from the bench, the court ordered appellant and appellee to go to therapy. The circuit court entered a written order on October 11, 2012. In its written order, the circuit court stated that appellee's actions in switching B.G. between three schools and her actions with T.G. at Access "compel[led] the Court to place responsibility for all educational decisions regarding the children with Defendant [Graham Goodloe]." While appellant was to consult appellee regarding educational plans for the children, appellant was given authority to make the final decisions. The court ordered physical custody to remain with the mother, finding that "even though significant issues were raised, the totality of the facts presented at Court do not rise to a level of material change of circumstances in which to justify a change of custody." Finally, the court modified appellant's visitation to include picking them up at school Friday and keeping them until Wednesday morning every other weekend.[5]

Appellant filed a motion to modify the court's October 11, 2012 order. Specifically, appellant requested that (1) he be granted authority to make educational and medical

---

[5]Appellant was awarded visitation from Friday after school to Tuesday morning in the divorce decree.

decisions as to T.G., due to those decisions being "inextricably linked"; (2) the parties be granted week-to-week visitations or, alternatively, that the Wednesday night visitation be overnight and not until 7:30 p.m. because of difficulty in transitioning for T.G.; and (3) the court find that there was a material change in circumstances to justify a change in custody and grant the parties joint custody. Appellant also requested that the court appoint a therapist to counsel appellant and appellee due to appellee's refusal to comply with the court's order that they seek counseling. Appellee responded on November 5, 2012.

A hearing on appellant's motion to modify the order was held on November 13, 2012. From the bench, the court appointed Sheila Strong as therapist for appellee and appellant; granted appellant final authority on medical decisions relating to T.G.'s education; left appellee as primary custodian; and left visitation as previously ordered. An amended order reflecting these changes, its order from the bench during the July 10, 2012 hearing that T.G. return to Access, and leaving all other provisions from the October 11, 2012 order in effect, was filed on November 16, 2012. This timely appeal followed.

This court reviews child-custody cases de novo.[6] For custody to be changed, the burden is on the noncustodial parent to prove a material change of circumstances such that a modification of the custody decree is in the best interest of the child.[7] The court must first determine that a material change in circumstances has occurred since the last order of

---

[6]*Putt v. Suttles*, 2011 Ark. App. 688, at 11, 386 S.W.3d 623, 629 (citing *Gibson v. Gibson*, 2010 Ark. App. 741).

[7]*Stills v. Stills*, 2010 Ark. 132, at 12, 361 S.W.3d 823, 830 (citing *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009)).

SLIP OPINION

custody; if that threshold is met, the court must then determine who should have custody with the sole consideration being the best interest of the child.[8] The circuit court's findings in this regard will not be reversed unless they are clearly erroneous.[9] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made.[10] Because the question of whether the trial court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the trial judge to evaluate the witnesses, their testimony, and the child's best interest.[11] In fact, there are no cases in which the superior position, ability, and opportunity of the trial judge to observe the parties carry as great a weight as those involving minor children.[12] While custody is always modifiable, in order to promote stability and continuity for the children and to discourage repeated litigation of the same issues, our courts require a more rigid standard for custody modification

---

[8]*Davis v. Sheriff*, 2009 Ark. App. 347, at 5, 308 S.W.3d 169, 172 (citing *Gerot v. Gerot*, 76 Ark. App. 138, 61 S.W.3d 890 (2001)).

[9]*Boudreau v. Pierce*, 2011 Ark. App. 457, at 11, 384 S.W.3d 664, 671 (citing *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002)).

[10]*Id.*

[11]*Putt*, 2011 Ark. App. 688, at 11, 386 S.W.3d at 629.

[12]*Id.*

SLIP OPINION

than for initial custody determinations.[13] It is not this court's job to retry this case or to substitute our opinion for that of the trial judge.[14]

Appellant and appellee agreed, in their September 9, 2010 divorce decree, to a custody arrangement where appellee would have custody of the children. None of the court's intermediary orders between the divorce decree and its October order and November amended order resolved the issue of custody. An order is not final when it adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties.[15] Moreover, where the order appealed from reflects that further proceedings are pending, which do not involve merely collateral matters, the order is not final.[16] Because none of the intermediary orders were final, the last order of custody was the divorce decree entered September 9, 2010. Therefore, we are permitted to consider all facts and circumstances arising after entry of the divorce decree in reviewing the circuit court's decision.

The major change since entry of the divorce decree is that T.G. was diagnosed with autism. A lot of the problems cited by appellant, and the court, stem from T.G.'s diagnosis. In its orders denying appellant's motion for change of custody, the court cited the following problems with regard to B.G.:

---

[13]*Walker v. Torres*, 83 Ark. App. 135, 138, 118 S.W.3d 148, 150 (2003) (citing *Vo v. Vo*, 78 Ark. App. 134, 79 S.W.3d 388 (2002)).

[14]*Harrison v. Harrison*, 102 Ark. App. 131, 139, 287 S.W.3d 601, 608 (2008).

[15]*Carek v. Carek*, 2011 Ark. App. 770, at 5 (citing *Farrell v. Farrell*, 359 Ark. 1, 193 S.W.3d 734 (2004)).

[16]*Id.* (citing *Roberts v. Roberts*, 70 Ark. App. 94, 14 S.W.3d 529 (2000)).

1. B.G. had twenty absences and nineteen tardies during the 2011–2012 school year, all but six absences and two tardies of which occurred in the first semester of the school year;

2. appellee's removal of B.G. from Episcopal several weeks into the school year to enroll her in Forest Park, only to remove her from Forest Park and return her to Episcopal two weeks later; and

3. appellee's enrollment of B.G. in a new school (Holy Souls) as a first grader despite Episcopal's recommendation that she repeat kindergarten.

Regarding T.G., the court's cited problems dealt with appellee's actions at Access and included:

1. appellee's failure to return T.G. to Access for seven and one half weeks after his suspension;[17] and

2. appellee's failure to return T.G. to Access once he was permitted to return.[18]

Despite these issues, the record shows, and the court stated, that B.G.'s absences and tardies "decreased substantially for the Spring 2012 semester," appellee did not object to Holy Souls's assessment of and decision to place B.G. in kindergarten one week into school, and B.G. "was performing well at the kindergarten level" by all indications. As to T.G., the court

---

[17]The suspension was indefinite as it was pending medical intervention for T.G. However, during the suspension, T.G. was permitted to continue receiving outpatient therapy at Access.

[18]The court also cited appellee's inability to be contacted about outpatient speech and occupational therapy for T.G. due to appellee's full voice mailbox.

ordered that he be re-enrolled in Access in accordance with appellant's wishes.[19] Furthermore, though it was early in the 2012–2013 school year, appellant put forth no new complaints against appellee regarding her care of either child at the September custody hearing.[20]

It is very clear that appellee made some decisions that, at the least, were questionable, but the issue is not whether she made the decisions, as the fact that she made questionable decisions would not, by default, warrant a change in custody. The issue is whether those decisions amount to a material change in circumstances.

The law of child custody cannot be applied in a rigid and mechanical fashion, as to do so conflicts with both statutory and well-settled law that custody awards are to be made in accordance with the welfare and best interests of the child.[21] Custody is not awarded to reward or punish either parent.[22] The courts must be keenly alert to the necessity of preventing the shortcomings or merits of the parents from overshadowing that which is best for the child.[23]

---

[19]In response to appellant's counterclaim for custody, among other things, appellee wrote "The Plaintiff affirmatively states that it is not in the minor child's best interest to be returned to Access School." She clearly did not agree with T.G. attending Access.

[20]The only complaint we noted from appellant is that B.G. and T.G. had both been tardy once during the 2012–2013 school year.

[21]*Kerby v. Kerby*, 31 Ark. App. 260, 264, 792 S.W.2d 364, 366 (1990) (citing *Riddle v. Riddle*, 28 Ark. App. 344, 775 S.W.2d 513 (1989)).

[22]*Harrison v. Harrison*, 102 Ark. App. 131, 137, 287 S.W.3d 601, 606 (citing *Eaton v. Dixon*, 69 Ark. App. 9, 9 S.W.3d 535 (2000)).

[23]*Kerby*, 31 Ark. App. at 265, 792 S.W.2d at 366 (citing *Johnson v. Arledge*, 258 Ark. 608, 527 S.W.2d 917 (1975)).

"Custody involves legal custody (decision-making authority) and physical custody (caregiving authority), and an award of custody usu[ally] grants both rights."[24] "Legal custody" is defined as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare."[25] "[P]hysical custody" is defined as "[t]he right to have the child live with the person awarded custody by the court."[26]

In this case, appellee, though supported by a nanny, was unable to get either child to school consistently; made major educational decisions without research;[27] was not interactive or involved in T.G.'s curriculum at Access;[28] failed to get the required medical plan for T.G.'s return to school;[29] and failed to take T.G. to any therapy, only taking him to Dr.

---

[24]*D.L.R. v. N.K.*, 2012 Ark. App. 316, at 4, ___ S.W.3d ___, ___ (citing Black's Law Dictionary 441 (9th ed. 2009)).

[25]*Id.*

[26]*Id.*

[27]Appellant testified that she "didn't look at the Forest Park education or see what they had to offer before transferring [B.G.]" to Forest Park.

[28]Testimony from staff at Access was that appellee could not be reached by phone, rarely attended sessions, and was not interactive with T.G. when she dropped him off, despite the need for autistic children, as stated in various testimonies, to have consistently predictable lifestyles bolstered by parental support in school and at home. Meanwhile, staff from Access testified that appellant regularly communicated with them regarding T.G.'s progress, participated in T.G.'s therapy, and prevented meltdowns because helped T.G. transition easily into the classroom during drop-off.

[29]Dr. Schulz testified that it is important for an autistic child to have a routine and that if he were removed from school for some reason, "it would be important to get him back in a structured situation as quickly as possible." He also testified that "if there needed to be a medical plan in place to get back in school, that should have been accomplished fairly quickly." He did not advocate Access, as it was one of a few programs that he stated were

11

SLIP OPINION

Burge, during his seven-and-one-half-week suspension, though the standard required much more.[30]

Despite these facts, the court found no material change in circumstances that would require a change of physical custody, but then it specifically found a change in circumstances material enough to require a change in legal custody. Because there was no evidence in the record that appellee's care of the children was otherwise inadequate, the circuit court chose to modify legal custody by taking the authority for educational decision making for both children, and medical decision making for T.G., from appellee and giving it to appellant. In addition, the court granted appellant additional visitation. While we understand that these modifications were the circuit court's attempt to tailor the custody agreement in the best way to meet the needs of the children given the circumstances, we find that they are not enough.

Parenting requires constant decision-making. It is illogical that appellant would be granted decision-making authority on such major issues as education and medical, but be

---

successful, only that T.G. needed to be returned to a structured program quickly after removal from another.

[30]Dr. Burge, a psychologist, testified that "it's important that I work with T.G.'s pediatrician and psychiatrist" and that speech and occupational therapy were part of his plan for T.G. However, he testified that he provides neither speech nor occupational therapy, had not communicated with Access, which did provide those therapies to T.G., and had not spoken with Dr. Schulz. The record does not show whether he spoke with T.G.'s pediatrician. Dr. Schulz testified at his deposition that a minimum of twenty hours per week of intervention or developmental therapy was necessary as it "is becoming the standard of care" and that T.G. needed an interdisciplinary team. Dr. Burge only met with T.G. one hour per week. Dr. Schulz also testified that "[i]f T.G. were not allowed to participate in the classroom, but [was] still able to participate in speech and occupational therapy, that would be important for T.G. to continue." The record shows that T.G. only received therapy during the seven-and-one-half-week suspension when his father took him to outpatient therapy at Access during his visitation.

prohibited from having physical custody of the children. It is for this reason that legal custody typically goes to the parent with physical custody. It is in the best interest of the children to reside with the parent who is making major decisions about their lives. If the circuit court found, as it did, a material change in circumstances to change legal custody on such major issues, it follows that a change in physical custody is warranted. The circuit court's finding that there was no material change in circumstances that would warrant a change in physical custody was clearly erroneous; therefore, we reverse.

Reversed.

WALMSLEY and HIXSON, JJ., agree.

*Dover Dixon Horne, PLLC*, by: *W. Michael Reif*, for appellant.

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.*, by: *Traci LaCerra* and *Mary Claire McLaurin*, for appellee.