

Cite as 2014 Ark. 300

# SUPREME COURT OF ARKANSAS

No. CV–13–1000

| | | |
|---|---|---|
| GRAHAM GOODLOE | | **Opinion Delivered** June 26, 2014 |
| | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTEENTH DIVISION |
| V. | | |
| MARCIA GOODLOE | | [NO. DR-10-437] |
| | APPELLEE | HONORABLE VANN SMITH, JUDGE |
| | | <u>REMANDED; COURT OF APPEALS'</u> <u>OPINION VACATED</u>. |

**DONALD L. CORBIN, Associate Justice**

This appeal is from child-custody orders entered by the Pulaski County Circuit Court on October 11, 2012, and November 13, 2012. This court granted a petition for review filed by Appellee Marcia Goodloe following a decision by the court of appeals in *Goodloe v. Goodloe*, 2013 Ark. App. 624, ___ S.W.3d ___, wherein the court of appeals reversed the circuit court's order leaving primary custody with Marcia but granting Appellant Graham Goodloe certain decision-making authority with regard to the parties' two minor children, B.G. and T.G. When this court grants a petition for review of a decision by the court of appeals, we treat the appeal as if it had been originally filed in this court. *Singletary v. Singletary*, 2013 Ark. 506, ___ S.W.3d ___. We remand this case to the circuit court and vacate the order of the court of appeals.

After we had granted the petition for review, Marcia sought and received permission to file a supplemental brief with this court. After her supplemental brief had been filed, Graham filed in this court a motion to dismiss the appeal. Therein, Graham stated that the circuit court had entered an order on March 11, 2014, temporarily changing custody of the parties' minor children to Graham, and the pending appeal was therefore moot. Marcia filed a response, asserting that the appeal was not moot because the circuit court's order was a temporary order that could not be appealed. Moreover, Marcia asserted that it was necessary for this court to clarify what she deemed to be a conflict between this court's decision in *Singletary*, 2013 Ark. 506, ___ S.W.3d ___, and the court of appeals' decision in this case. This court denied the motion to dismiss on April 17, 2014.

Graham now asserts on appeal that the circuit court erred in refusing to award him physical custody of the children when it found a material change in circumstances justifying a change in educational decision–making authority for B.G. and T.G., and medical decision–making authority for T.G., from Marcia to Graham. According to Graham, the circuit court's finding that physical custody should remain with Marcia was contrary to the preponderance of the evidence and not in the best interest of the children.

Although this appeal is not moot,[1] the issues presented regarding a material change in circumstances and the best interest of the minor children have once again changed, as demonstrated by the circuit court's order granting temporary custody to Graham. While the circuit court's most recent order governing custody of the minor children is temporary, Graham has requested a permanent change of custody based on allegations of a material change in circumstances that occurred after entry of the order that is the subject of this appeal.[2] Thus, any opinion offered by this court with regard to the 2012 orders granting Graham certain decision-making authority but leaving physical custody with Marcia would be purely advisory. And it is well settled that this court does not issue advisory opinions. *See DIRECTV, Inc. v. Murray*, 2012 Ark. 366, 423 S.W.3d 555. Accordingly, because of the unique procedural history of this case, we remand it to the circuit court for consideration of any pending matters related to the custody of the minor children, B.G. and T.G.

Remanded; court of appeals' opinion vacated.

BAKER, GOODSON, and HART, JJ., dissent.

---

[1]The circuit court's March 11, 2014 order, which was attached as an exhibit to pleadings filed in this court, clearly states that the change of custody to Graham is temporary and "in place until further orders from the Court." Only final orders of custody are specifically appealable under Arkansas Rule of Appellate Procedure–Civil 2(d); *see also Sandlin v. Sandlin*, 290 Ark. 366, 719 S.W.2d 433 (1986); *Chancellor v. Chancellor*, 282 Ark. 227, 667 S.W.2d 950 (1984).

[2]Attached as an exhibit to Graham's motion to dismiss the appeal was his "Motion for Change of Custody and Emergency Hearing," wherein he requested immediate temporary and permanent custody of the children.

**COURTNEY HUDSON GOODSON, Justice, dissenting.** Appellant Graham Goodloe has appealed the circuit court's denial of his motion for a change of custody. For reversal, he contends that the circuit court erred by not finding a material change of circumstances and by not granting him physical custody of the children, although the court had found sufficient justification to warrant giving him significant decision-making authority. Rather than address the merits of this controversy, the majority simply remands this case to the circuit court because, via motion to dismiss on grounds of mootness, it has come to this court's attention that Graham has filed another motion for a change of custody and that the circuit court has temporarily changed custody to Graham pending a final hearing. I dissent because this court should address the merits of the appeal.

The circuit court's order denying Graham's motion for a change of custody is obviously a final order. As such, it is subject to appeal. This court has denied Graham's motion to dismiss the appeal as moot because the circuit court's most recent order vesting custody in Graham was only temporary in nature. Regardless of what may be happening in circuit court at this time, the issue raised by Graham in this appeal is ripe for review and should be settled by this court. The majority recognizes that this case is not moot. Because the issue is not moot, it cannot be said that our opinion would be purely advisory. *See Chandler v. Martin ex rel. State*, 2014 Ark. 219 (recognizing that an advisory opinion is one that offers an opinion on a moot issue). Therefore, this court should address the issue raised on appeal.

4

SLIP OPINION

JOSEPHINE LINKER HART, Justice, dissenting. In this case, we granted review after a unanimous court of appeals decision reversed the circuit court and awarded legal custody of the two minor children to their father, Graham Goodloe. *Goodloe v. Goodloe*, 2013 Ark. App. 624. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *Payne v. Ark. Dep't of Human Servs.*, 2013 Ark. 284. On appeal, Graham argues that the circuit court erred in not granting him physical custody when it found a material change in circumstances and changed educational decision-making authority for B.G., and medical decision-making authority for T.G. from the children's mother, Marcia Goodloe, to him. I would affirm the circuit court.

In the parties' consent divorce decree, entered September 9, 2010, Marcia was awarded primary physical custody of the two minor children: B.G., born July 13, 2006, who was at the time attending a preschool program at Episcopal Collegiate School (Episcopal), and T.G., born October 25, 2007, was too young for a school program and who was diagnosed with autism four months after the divorce was final. Although Marcia had legal custody, the decree expressly permitted Graham to have "input" on important matters affecting the children, including health-care and education matters.

On March 27, 2012, Graham petitioned for an emergency change of custody. He alleged that (1) Marcia kept the children up all night while she drank and used drugs with her friends; (2) B.G. was absent so many days from school during the 2011–12 school year that the school made a report thereof to the Arkansas Department of Human Services and B.G. might be required to repeat kindergarten; (3) B.G. was sent to school on January 10, 2012,

with a piece of glass in her foot; and (4) T.G. was absent so many days that he was in jeopardy of losing his slot at ACCESS, a school for developmentally disabled children, which required 90% attendance. The circuit court issued an ex parte order in Graham's favor the day he filed his petition and ordered both parties to take drug tests.

Following an April 4, 2012 hearing during which the circuit court learned that both parties had passed the court-ordered drug tests, the circuit court set aside its ex parte order. In its April 25, 2012 order, the circuit court reserved the issue of child custody for a final hearing on the merits. The circuit court noted that it had earlier granted Graham's ex parte motion based primarily on the affidavit of Jacqueline Headlee, who had made allegations of Marcia's drug use and her consorting with drug dealers in her home. However, Headlee did not appear at the hearing. At a subsequent hearing, Headlee did testify, but the circuit court expressly found her testimony to be not credible.

On May 8, 2012, a meeting was held with staff at ACCESS, Graham, and Marcia. During that meeting, school officials informed the parents that T.G.'s aggressive behavior was increasing as was the amount of time being spent one-on-one with T.G. They recommended that T.G. see a psychiatrist and start a medical plan. Marcia did not act on this recommendation. On May 21, 2012, T.G. was suspended from ACCESS for escalating aggressive behavior. His return was conditioned upon T.G. having a medical plan. Graham set up appointments with Dr. Eldon Schulz, one of the doctors who had diagnosed T.G. with autism. Those appointments were scheduled for times when Marcia had physical custody of T.G., and she did not keep the appointments. On June 20, 2012, while Graham had

scheduled visitation, he took the child to Dr. Schulz. Dr. Schulz prescribed clonidine for T.G. After a meeting with ACCESS officials, T.G. was allowed to return to the school, effective July 2, 2012.

However, on June 25, 2012, Marcia filed a motion for contempt against Graham because he had taken T.G. to Dr. Schulz without her knowledge and had given T.G. medicine over her objection. Marcia claimed that T.G. was being treated for autism by Dr. Carlton Burge, which Graham was aware of, and that Dr. Schulz's treatment conflicted with the treatment recommended by Dr. Burge. Graham denied having been consulted or given any information regarding Dr. Burge and that he notified Marcia of his intent to take T.G. to Dr. Schulz. He also counterclaimed for contempt due to Marcia's failure (1) in the five weeks that had passed since T.G.'s dismissal from ACCESS, to schedule an appointment so that a medical plan could be started as was necessary for his return to ACCESS; (2) to take T.G. to the appointments appellant had previously set, necessitating his action in taking T.G. to see a psychiatrist; (3) to take T.G. to outpatient occupational and speech-therapy sessions at ACCESS, during the same five-week period since May 22, 2012; (4) to consult with him on T.G.'s treatment; and (5) to allow him to communicate with the children when they were in her care.

Marcia subsequently sent an email to Ms. Smith, preschool director at Access, notifying her that she did not want T.G. to attend ACCESS. On July 3, 2012, Graham filed an amended counterclaim in which he asserted additionally that Marcia withdrew T.G. from

ACCESS without his knowledge and that appellant had been notified by Episcopal that B.G. would have to repeat kindergarten.

After a hearing on the parties' motions on July 10, 2012, the circuit court ordered, from the bench, that T.G. should continue receiving treatment from his current physicians and therapist, that Graham and Marcia should follow the doctors' recommendations, and that T.G. was to attend Access. The issue of custody was reserved for the final hearing. An order stating these findings was entered on August 9, 2012.

A final hearing on the merits of the custody issue was held on September 20 and 21, 2012. Graham attempted to discredit Marcia's parenting skills.

Shelly Short testified that on May 25, 2011, she discovered T.G. walking on Kavanaugh Street wearing only a t-shirt. T.G. was a couple of blocks from his home. A neighbor stopped and thought she recognized the child. The police were called, but before they arrived, Marcia arrived on the scene and retrieved T.G.

Officer Cedric Nelson testified that on October 10, 2011, he responded to Marcia's call claiming that T.G. was missing. The child was discovered in Marcia's living room, hiding under some blankets.

Nancy Handloser, assistant principal at Holy Souls School testified that Marcia applied to enroll B.G. in first grade on July 2, 2012. After a few days in first grade, however, B.G.'s teacher recommended that the child be placed back in kindergarten. Handloser stated that she was not aware of any long-term effects on B.G. as a result of the decision to repeat kindergarten. According to Handloser, B.G. was performing well in kindergarten.

Monika Garner-Smith, the preschool director at ACCESS testified that T.G.'s behavior caused the school to require a "medical intervention." She noted increasing aggressiveness culminating in a May 22 incident in which T.G. hurt a child. She also criticized the communication between Graham and Marcia. Garner-Smith stated, "We needed consistency. We needed him at school. We needed to give him intensive services. And we needed to know what was going on, and the parents need to know what's going on together." She also stated that T.G.'s attendance improved after the April 2012 hearing and "really improved" after July. She admitted that she had contact only with Graham. Graham promised to do everything he could "on his end." According to Garner-Smith, they worked out a special schedule on the days that Graham had T.G. to provide outpatient therapy. She claimed that Marcia was difficult to contact. She did, however, state that both parents were present at a school meeting regarding T.G.'s return after he had begun receiving medication. She stated that once T.G. was medicated with clonidine, he "performed okay," but she was never sure if the child was being medicated consistently. Garner-Smith further testified that she had seen Graham interact with T.G. when he picked the child up and opined that Graham had a "very calming effect" on him. She noted that she observed Graham speaking with T.G.'s therapist and at the school's open house.

Stephanie Chester, T.G.'s speech therapist at ACCESS, testified that T.G. functioned at about the 18-month-old level expressively after thirteen months of therapy with her. She asserted that it is important that parents be involved in what she is doing. Chester stated that Graham was responsive to her emails and notes; Marcia was not. She conceded that Marcia

9

may have spoken to her, but noted that Graham has come to speech-therapy sessions. Chester stated that Marcia attended the most recent yearly "IPP meeting," but did not attend last years's meeting. She conceded on cross-examination that Marcia did email her and tried to reschedule the meeting because she had a conflict. Chester also claimed to notice a difference in T.G.'s behavior when Graham brought the child to school versus when Marcia brought the child—T.G. "transitions" better when Graham drops the child off. She noted that when Marcia brings the child there is "more of a rush." She noted also that T.G.'s nanny, Bonita, "typically" brings the child to school.

Kelley Kennedy, principal of the lower school at Episcopal Collegiate School, testified that B.G. had 43 absences and 29 tardies when the child was in preschool. He conceded that preschool is not compulsory. He noted that in B.G.'s kindergarten year, including five days at Forest Park Elementary, she had missed 25 days of school. However, he admitted that the child's absences improved between the third and fourth quarter from two to zero. He stated that B.G. was retained in kindergarten because she had not progressed sufficiently.

Lena Hopkins, the nurse at Episcopal, testified that on January 10, 2012, B.G. came to the health room with her foot loosely wrapped in a paper-towel-like product with tape around it. When she closely examined the child's foot, she discovered a small shard of glass. She removed the glass and dressed the wound. Hopkins recalled a subsequent incident on February 22 when B.G. was brought to the health room because the child was wearing her pajamas under her school uniform.

SLIP OPINION

Anne McPherson, B.G.'s kindergarten teacher at Episcopal testified that B.G. "is the sweetest little child." She further described her as "very fun loving," "tender-hearted," "bright," and "just a joy." McPherson confirmed the glass-in-the-foot incident and the pajamas-under-the-uniform incident. According to McPherson, B.G. came to school wearing pajamas under her uniform four times, but she allowed the child to keep wearing them on the other occasions. She also noted that on March 9, B.G. shared "art supplies," which included beer-bottle caps and wine corks. She recalled that one of B.G.'s classmates "made an elaborate project with them." McPherson stated that she was concerned with B.G.'s tardiness and attendance because consistency was important with children of that age. She recalled that Graham was not happy with the child's absences and tardiness, but could not recall Marcia's reaction. She also confirmed that she recommended that B.G. be retained in kindergarten.

Ted Goodloe, Graham's father, testified that B.G. was "very bright, extremely verbal, very, very, talkative." He also stated that it was "heart-wrenching" because "you can't have a conversation" with T.G. He noted that sometimes it is apparent that T.G. understands what is being said, but he never reacts to what you are doing. He described Graham as a very good, patient parent. He also opined that T.G.'s behavior had improved after he had been taking clonidine. He also noted that when T.G. is present in his home, he locks the doors because the child has tried to open them and leave. He also noted that he wired the fence closed for that reason.

Dr. Eldon Schulz testified that his practice primarily involved children with autism. He began treating T.G. on January 20, 2011. Both parents attended the initial appointment.

11

He noted that structure and routine was important for children with autism. Subsequently, the child presented with Graham, who told him that T.G. had been dismissed from ACCESS because of his aggressive behavior. He stated, however, that he thinks of "maladaptive or aggressive behavior first as a mode of communication." After discussion with Graham, he prescribed clonidine, which is commonly used to control impulsive behavior in autistic children.

Jay Morgan, a child and adolescent therapist testified that he provided counseling to Graham and Marcia. He found Graham "more open to listening and understanding Marcia's viewpoint," but Marcia "had more difficulty with that." Graham consistently attended sessions, but Marcia stopped attending after two appointments.

Graham testified that he was a junior high school teacher in the Little Rock School District. His first three years as a teacher were spent teaching special education. He described B.G. as a "very gregarious young girl," but noted that T.G. was "nonverbal." According to Graham, T.G. understands a few basic phrases. He complained about the children's school attendance and tardiness. He asserted that he was responsible for getting T.G. to an appointment with Dr. Schulz, which allowed the child to be readmitted to ACCESS. Graham criticized Marcia's decision to take B.G. out of kindergarten and enroll her at Forest Park, which was done without consulting him. He likewise disagreed with Marcia's decision to enroll B.G. in Holy Souls. He wanted to keep the child at Episcopal. Graham noted the importance of routine for a child with autism. He admitted that T.G. did "escape" on one occasion while in his care.

12

SLIP OPINION

Graham further testified that counseling with Jay Morgan did not succeed, but noted that Marcia attended only two sessions, while he was always ready and willing to attend. He also complained about Marcia's prescription drug use—she was on medication for attention deficit disorder. Graham also noted that Marcia had made $3,467.09 in liquor-store purchases over a sixteen-month period, although he was unable to say with certainty what portion of that total went for cigarettes and non-alcoholic items. He complained about visitation problems, but admitted that Marcia has also accommodated changes.

Graham conceded that B.G. was "fairly healthy" and was "doing well." He also conceded that when he agreed that Marcia was "fit and proper" to have custody of the children, he was aware that she drank alcohol and asserted that she drank to excess during the marriage.

Marcia admitted that her relationship with Graham was strained. She claimed that her alcohol consumption was less than two bottles of wine per week. She noted that she made other purchases than liquor at the liquor store. She confirmed that she was taking medication for attention deficit disorder. Marcia defended her decision to enroll B.G. at Forest Park because B.G. wanted to attend school with her neighborhood friends. She transferred B.G. back to Episcopal because B.G. was unhappy at Forest Park. She defended her decision stating, "I wasn't going to let my child be miserable because of what I wanted." She ascribed much of the tardiness to B.G.'s not being a "morning person." She also noted that for part of the time, both of her feet were broken, which made driving difficult. Regarding the glass-in-the-foot incident, she claimed that she checked B.G.'s foot and found nothing. She

claimed that the child was a "hypochondriac," and essentially was just humoring the child that day. She also admitted that she allowed B.G. to wear her pajamas under her school uniform.

Marcia asserted that the decision to enroll B.G. in first grade at Holy Souls was made in consultation with Handloser. She stopped attending counseling with Jay Morgan because she thought he was "a whacko." According to Marcia, he was not helping her and she "got yelled at." She noted that she was doing a better job getting the children to school because Bonita was assisting her.

Regarding Graham, she asserted that, post-divorce, he was arrested for third-degree domestic battery. She also asserted that he was a heavy marijuana smoker. Marcia admitted that, initially, she opposed giving T.G. medication, preferring instead to pursue other therapy with Dr. Burge. At first, she noted significant problems with T.G.'s medication, but was currently satisfied because adjustments had been made. According to Marcia, B.G. is doing well at Holy Souls.

In her case-in-chief, Marcia presented the testimony of private investigator Andrew Myers, who documented numerous instances of Graham leaving T.G. unsupervised outside his home. He recalled specific instances in which T.G. was alone in a public street.

Bonita McMurray testified that she was employed by Marcia as a nanny. Her hours are 6:30 to 8:00 in the morning and 2:30 to 3:30 in the afternoon. She described Marcia as "a great mother." She ascribed some of the communication difficulty asserted by ACCESS to Graham because he removed notes from T.G.'s backpack. McMurray claimed that she saw no evidence of excessive drinking by Marcia. She agreed that B.G. was a hypochondriac and

corroborated Marcia's claim that no glass was visible in the child's foot the morning of the glass-in-the-foot incident.

At the close of the hearing, the circuit court ordered Graham and Marcia to go to therapy. In the October 11, 2012 written order, the circuit court found that Marcia's actions in switching B.G. between three schools and her actions with T.G. at ACCESS "compel[led] the Court to place responsibility for all educational decisions regarding the children with Defendant [Graham]." While Graham was to consult with Marcia regarding educational plans for the children, Graham was given authority to make the final decisions. The court ordered physical custody to remain with Marcia, finding that "even though significant issues were raised, the totality of the facts presented at Court do not rise to a level of material change of circumstances in which to justify a change of custody." Finally, the court modified appellant's visitation to include picking them up at school on Friday and keeping them until Wednesday morning every other weekend.

Appellant filed a motion to modify the circuit court's October 11, 2012 order. Specifically, Graham requested that he be granted authority to make educational and medical decisions as to T.G., due to those decisions being "inextricably linked"; that the parties be granted week-to-week visitations or, alternatively, that the Wednesday night visitation be overnight and not until 7:30 p.m. because of difficulty in transitioning for T.G.; and that the court find that there was a material change in circumstances to justify a change in custody and grant the parties joint custody. Graham also requested that the court appoint a therapist to counsel Marcia due to her refusal to comply with the court's order that they seek counseling.

A hearing on Graham's motion was held on November 13, 2012. The circuit court appointed Sheila Strong as the parties' therapist; granted Graham final authority on medical decisions relating to T.G.'s education; left Marcia as primary custodian; and left visitation as previously ordered. An amended order reflecting these changes, its order from the bench during the July 10, 2012 hearing that T.G. return to ACCESS, and leaving all other provisions from the October 11, 2012 order in effect, was filed on November 16, 2012. This timely appeal followed.

On appeal, Graham argues that the circuit court erred in not granting him physical custody when it found a material change in circumstances and changed educational decision-making authority for B.G., and medical decision-making authority for T.G. from Marcia to him. He recounts B.G.'s attendance problems, Marcia's decisions to change B.G.'s schools, the time that B.G. went to school with glass in her foot, and the times when B.G. wore Little Mermaid pajamas under her school uniform. He also recounts Marcia's resistance to the medical plan that the circuit court ultimately ordered and Marcia's failure to make T.G. reach the 90-percent attendance that ACCESS requires. Finally, Graham renews the allegations of Marcia's drug and alcohol use as well as her relationships with unsavory characters. I find this argument to be unpersuasive.

In domestic-relations cases, we review the evidence de novo and will not reverse the circuit court's findings unless they are clearly erroneous. *Moix v. Moix*, 2013 Ark. 478, ___ S.W.3d ____. We also give special deference to the circuit court's superior position in evaluating the witnesses, their testimony, and the child's best interest. *Id.* A circuit court in

SLIP OPINION

a domestic relations case may modify or vacate a prior order when it becomes aware of a material change in circumstances since the previous order. *Id.* However, when the issue involves a change in custody, a judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child. *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001)(citing *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988)).

By all accounts, B.G. was a bright, happy child who was thriving under the current custodial arrangement. I am mindful that B.G. had somewhat sporadic attendance at kindergarten and that she was required to repeat that level. However, the child was very near the minimum age for attending kindergarten when she was enrolled, and many of the deficiencies that the child displayed could best be attributed to immaturity, not lack of school attendance. Moreover, the circuit court adequately addressed whatever problems may have existed regarding educational decisions by placing that authority in Graham. Likewise, the circuit court adequately dealt with the parties' dispute over the course of treatment for T.G.'s autism.

While the majority relies on motions filed after an opinion was handed down by the court of appeals and this court had taken the case on review, those motions were denied by this court. Those motions cannot affect the disposition of the pending appeal. To the extent that circumstances may have changed, post–appeal, those issues must be addressed by the trial court. Based on the complete record before us, and due to the special deference that we afford circuit courts in proceedings that sound in equity, *Moix*, *supra*, I cannot say that the

circuit court clearly erred in not finding that there was a change in circumstances sufficient to justify a change in custody. *Lloyd v. Butts*, *supra*. I would vacate the court of appeals opinion and affirm the circuit court.

BAKER, J., joins.

*Dover Dixon Horne PLLC*, by: *W. Michael Reif* and *Carl F. "Trey" Cooper, III*, for appellant.

*Hilburn, Calhoon, Harper, Pruniski & Calhoun, Ltd.*, by: *Traci LaCerra*, *Lauren Hamilton*, and *Mary Claire McLaurin*, for appellee.